**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**EASTERN DIVISION**

_____

IN RE:
MARTIN BARRY PAUL,                                          Chapter 7
        DEBTOR                            Case No. 05-22881-WCH

_____

JEFFREY D. STERNKLAR, CHAPTER 7
TRUSTEE,
        PLAINTIFF,
                              Adversary Proceeding
v.                                                          No. 08-1069

HERITAGE AUCTION GALLERIES, INC.,
HERITAGE GALLERIES AND AUCTIONEERS,
HERITAGE CAPITAL CORPORATION,
HERITAGE AUCTIONS, INC., STEVEN IVY,
AND JAMES HALPERIN,
        DEFENDANTS.

_____

IN RE:
THE RARITIES GROUP, INC.,                                   Chapter 7
        DEBTOR                            Case No. 03-18371-WCH

_____

JEFFREY D. STERNKLAR, CHAPTER 7
TRUSTEE.,
        PLAINTIFF,
                              Adversary Proceeding
v.                                                          No. 08-1070

HERITAGE AUCTION GALLERIES, INC.,
HERITAGE GALLERIES AND AUCTIONEERS,
HERITAGE CAPITAL CORPORATION,
HERITAGE AUCTIONS, INC., STEVEN IVY,
AND JAMES HALPERIN,
        DEFENDANTS.

_____

**MEMORANDUM OF DECISION**

## I. INTRODUCTION

       The matters before the Court are the Motions to Dismiss or Stay and Compel Arbitration and

Alternative Motion to Dismiss Fraud Claims Pursuant to Rule 9(b) (the "Motion to Compel") filed

by Heritage Auction Galleries, Inc.,[1] Heritage Galleries and Auctioneers, Heritage Capital

Corporation, Heritage Auctions, Inc. (collectively, "Heritage"), Steven Ivy ("Ivy"), and James

Halperin ("Halperin") (collectively, the "Defendants") in two identical adversary proceedings

brought by Jeffrey D. Sternklar, Chapter 7 trustee (the "Trustee") for the estates of Martin Barry Paul

("Paul") and the Rarities Group, Inc. ("RGI") (collectively, the "Debtors"), and Paul (collectively,

the "Plaintiffs") asserting various counts arising from a prior business relationship between Paul and

Heritage.[2]  Through the Motion to Compel, the Defendants seek to enforce arbitration clauses

contained within various documents Paul executed, both as an individual and as an officer and

director of RGI, while participating in Heritage's coin auctions and stay or dismiss these adversary

proceedings.  In the alternative, the Defendants seek to dismiss the Plaintiffs' fraud claims under

Fed. R. Civ. P. 9(b).  For the reasons set forth below, I will enter an order denying the Motion to

Compel.

## II. BACKGROUND

From the outset, I note that the Trustee's allegations as set forth in the Complaint span

thousands of individual transactions involving both Debtors over the course of many years.  As such,

the allegations with respect to these transactions are generalized and somewhat vague.  The parties

have further complicated this matter by submitting numerous documents which may or may not

---

[1] According to a footnote in the Motion to Compel, Heritage Auction Galleries, Inc., is not the correct name of any Defendant or any entity affiliated with the Defendants.

[2] The parties have filed identical papers in each case using a joint caption.  Although these adversary proceedings have not been consolidated, I note that consolidation is appropriate under Fed. R. Civ. P. 42(a), made applicable to adversary proceedings by Fed. R. Bankr. P. 7042, because both involve the same nucleus of material fact and questions of law.  In the interest of clarity and expediency, I will refer to the adversary pleadings in the singular, and all docket citations will refer to Adv. P. No. 08-1070 unless stated otherwise.

relate to some or all of these transactions.  With this in mind, the relevant background of the dispute

is as follows.

Paul is a buyer and curator of rare coins.[3]  For many years, Paul operated RGI as a vehicle

for buying and selling coins, as well as sports and entertainment memorabilia.[4]  Heritage is a

collections auctioneer based in Dallas, Texas, and is purportedly the world's largest rare coin firm.[5]

Upon information and belief, Ivy and Halperin are co-chairmen of Heritage.[6]  Since the early 1980's,

Paul, or companies in which he held an ownership interest, have conducted business with Heritage

encompassing thousands of individual transactions.[7]

In the Complaint, the Trustee alleges that these transactions fall roughly into four categories:

consignments, purchases of memorabilia, split coin deals, and loans.[8]  In consignment transactions,

Paul or RGI would consign individual coins or memorabilia to Heritage, and pursuant to

consignment agreements, Heritage would, from time to time, advance funds to be applied against

the sale price.[9]  Commissions, interest rates, auction sale placements, and other terms would be

negotiated.[10]  In memorabilia purchase transactions, Paul or RGI would purchase individual

---

[3] Complaint, Docket No. 1, ¶ 2.

[4] *Id.*

[5] *Id.* at ¶ 3.

[6] *Id.*

[7] *Id.* at ¶¶ 8-9.

[8] *Id.* at ¶ 9.

[9] *Id.* at ¶ 9(a).

[10] *Id.*

memorabilia items at Heritage Auctions on credit, which Heritage would deliver.[11]  Split coin deals

were transactions where Heritage and Paul or RGI purchased coins together with the intention of

Heritage reselling them for profit.[12]  At times, Paul or RGI might curate the coins to increase their

grade and value.[13]  Profits from split coin deals would be split between Heritage and Paul or RGI

according to agreed formulae, taking into account the funds advanced by Heritage, an implied rate

of interest, expenses incurred in curating the coins, the grading, and the ultimate disposition of the

coin.[14]  From time to time, Heritage might also compensate Paul for curating services by an hourly

rate or a commission.[15]  In loan transactions, Heritage would advance money to Paul, purporting to

reserve a right to offset against Paul's share of future profits.[16]

 Over the course of their business relationship, the parties entered into numerous agreements

to govern these transactions.  The Defendants assert that its standard Terms and Conditions of

Auction (the "Standard Auction Terms") are applicable to all auction participants and transactions.

The Standard Auction Terms provide in relevant part:

**Dispute Resolution and Arbitration Provision**
45. By placing a bid or otherwise participating in the auction, Bidder accepts
these Terms and Conditions of Auction, and specifically agrees to the
alternative dispute resolution provided herein.  Arbitration replaces the right
to go to court, including the right to a jury trial.

---

[11] *Id.* at ¶ 9(b).

[12] *Id.* at ¶ 9(c).

[13] *Id.*

[14] *Id.*

[15] *Id.*

[16] *Id.* at ¶ 9(d).

4

* * *

48.    Arbitration Clause: All controversies or claims under this Agreement or arising from or pertaining to: this Agreement or related documents, or to the Properties consigned hereunder, or the enforcement or interpretation hereof of this or any related agreements, or damage to Properties, payment, or any other matter, or because of an alleged breach, default or misrepresentation under the provisions hereof or otherwise, that cannot be settled amicably within one (1) month from the date of notification of either party to the other of such dispute or question, which notice shall specify the details of such dispute or question, shall be settled by final and binding arbitration by one arbitrator appointed by the American Arbitration Association ("AAA"). The arbitration shall be conducted in Dallas, Dallas County, Texas in accordance with the then existing Commercial Arbitration Rules of the AAA. The arbitration shall be brought within two (2) years of the alleged breach, default or misrepresentation or the claim is waived. The prevailing party (a party that is awarded substantial and material relief on its claim or defense) may be awarded reasonable attorney's fees and costs. Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof; provided, however, that the law applicable to any controversy shall be the law of the State of Texas, regardless of its or any other jurisdiction's choice of law principles and under the provisions of the Federal Arbitration Act.

* * *

50.    In consideration of their participation or application for the Auction, a person or entity (whether the successful Bidder, a Bidder, a purchaser and/or other Auction Participant or registrant) agrees that all disputes in any way relating to, arising under, connected with, or incidental to these Terms and Conditions and purchases, or default in payment thereof, shall be arbitrated pursuant to the arbitration provision. In the event that any matter including actions to compel arbitration, construe this agreement, actions in aid or arbitration or otherwise needs to be litigated, such litigation shall be exclusively in the Courts of the State of Texas, in Dallas Country, Texas, and if necessary, the corresponding appellate courts. The successful Bidder, purchaser, or Auction participant also expressly submits himself to the personal jurisdiction of the State of Texas.[17]

---

[17] Terms and Conditions of Auction, Exhibit A-2, ¶ 45, 48, 50, Docket No. 10. I note that the footer to this document indicates that this page of the Standard Terms was revised on April 15, 2008.

Paul and/or RGI purportedly agreed to the Standard Auction Terms, including the arbitration clause, by placing bids and otherwise participating in Heritage's auction and by registering online at Heritage's internet auction site.[18]

Additionally, the Defendants attached other documents with arbitration clauses to the Motion to Compel. One was a document titled "Extended Payment Terms for Dealers with Preapproved Credit" (the "Extended Payment Terms") for Heritage's 2001 February Long Beach Signature Sale. Paul executed the Extended Payment Terms on February 23, 2001.[19] Paragraph 10 of the Extended Payment Terms provides:

> 10. All disputes in any way arising relating to, arising under, connected with, or incident to this agreement, shall be submitted to binding arbitration under the commercial rules of the American Arbitration Association (heard at Dallas, Texas) or if applicable, the Professional Numismatists Guild.[20]

The next attached document was an Auction Consignment Agreement (the "Consignment Agreement") executed by Paul on behalf of RGI on March, 19, 2002 for a Signature Sale to be held on or about April 25-27, 2002.[21] There are several notable things about the Consignment Agreement. First, a schedule of coins to be consigned is not attached to the agreement despite a reference to one in the first paragraph.[22] Second, the following notice appears before the signature block: "Important

---

[18] *See* Exhibits B, B-1, B-2, Docket No. 10.

[19] Exhibit A-6, Docket No. 10.

[20] Exhibit A-6, Docket No. 10, ¶ 10.

[21] Exhibit A-5, Docket No. 10.

[22] *Id.*

6

notice: Further items and conditions of this agreement appear on the reverse side."[23]   The document,

as submitted to the Court, does not have a reverse side.   There is, however, a second page titled

"General Consignment Terms and Conditions Auction Consignment Agreement" (the "Consignment

Terms").[24]   The Consignment Terms state as follows:

> The sale will be conducted in accordance with the Terms and Conditions of Sale that
> are printed in the Sale catalog, a copy of which you will receive approximately two
> weeks before a Signature Sale™, one week before a Bullet Auction™ . . . .
>
> * * *
>
> This Agreement is the entire agreement between you and us concerning the
> consignment of your Coins, and it supercedes any prior agreement or representation.
> This Agreement can only be changed in writing by both you and us. . . .
>
> * * *
>
> Arbitration Clause: if any disputes arise regarding any matter pertaining to the sale,
> Consignor and Auctioneer agree that the dispute shall be submitted to binding
> arbitration in accordance with the rules of the Professional Numismatists Guild
> (PNG) or the commercial rules of the American Arbitration Association (A.A.A.).
> The A.A.A. arbitration shall be conducted under the provisions of the Federal
> Arbitration Act with locale in Dallas, Texas. . . .[25]

The signature block of the Consignment Agreement contains three boxes.   One is signed by Ivy, as

a consignment assistant on behalf of Heritage.[26]   The box indicating acceptance by the consignor is

conspicuously blank.[27]   The third box, apparently to be completed when the consignor is a

---

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] *Id.*

7

corporation, is signed by Paul as President of RGI, but that box does not contain any language

indicating assent to the Consignment Terms.[28]

    Four invoices were attached to both the Complaint and Motion to Compel with dates ranging

from October 25, 2004, to May 28, 2005.[29]  Each contain the following acknowledgment: "I have

read and agree to the Terms and Conditions of Sale as they appear in the catalogue."[30]  A document

titled Terms & Conditions of Sale (the "Terms of Sale"), attached to an executed document titled

"Central States Signature Sale & Internet Bullet Auction, April 25-28, 2002 (the "Bullet Auction

Document")," similarly contains an arbitration clause.[31]  It is unclear whether the Terms of Sale is

the document referenced by the invoices and Consignment Agreement.  In the Motion to Compel,

the Defendants assert that the invoices reference the Standard Auction Terms.  Nonetheless, it

provides in part:

> If any disputes arise regarding payment, authenticity, or grading or any other matter
> pertaining to the sale, the bidder or a participant in the Auction Sale and/or the
> Auctioneer agree that the dispute shall be submitted, if otherwise mutually
> unresolved, to binding arbitration in accordance with the rules of the Professional
> Numismatists Guild (PNG) or American Arbitration Association (A.A.A.).  The
> A.A.A. arbitration shall be conducted under the provisions of the Federal Arbitration
> Act with locale in Dallas, Texas. . . .[32]

The Bullet Auction Document appears to be an agreement by which Paul acknowledged that he

---

[28] *Id.*

[29] Invoices A627376, A633482, A695848, A695849, Exhibit A, Docket No. 2.

[30] *Id.*

[31] Exhibit A-7, Docket No. 10.

[32] *Id.* at ¶ 16.

agreed to the Terms of Sale in consideration of his participation in that particular auction.[33]

On May 1, 2003, Paul, on behalf of RGI, executed the Participation Agreement by which RGI, through Paul, would provide services to Heritage as an independent contractor.[34]  Under Heritage's general direction and with funds it provided, Paul would purchase "numismatic items" and, if necessary, curate them.[35]  Heritage would then resell the coins through its normal business operations.[36]  As compensation, Paul would be paid an advance of $30,000 per month against his fifty percent commission from the net profits of the resales.[37]  The Participation Agreement further provided:

> 4.  Term.  Provided Paul exclusively performs Participant's duties under this Agreement, the term of this Agreement shall commence from May 1 and shall continue for six (6) months, and is automatically renewed at six (6) month intervals, upon the same terms and conditions, or until sooner terminated by either the Company or the Participant upon provided written notice to the non-terminating party, which notice is deemed complete upon posting by certified mail.  Termination may be by either party at any time either for or without cause.  *Upon termination of this Agreement, and, except as other provided in Sections 9, 11, 14, 16, and the Arbitration section of 24 of this Agreement, all rights and obligations of the Company and the Participant under this Agreement shall cease.*

> * * *

> 18.  Prior Agreements.  The parties hereto stipulate and acknowledge that they previously entered into a series of prior agreements from time to time.  *Any and all prior agreements of the parties with respect to the subject matter hereof, whether oral or in writing, are superseded by the terms of this Agreement. . . .*

---

[33] *Id.*

[34] Exhibit A-1, Docket No. 10, ¶ 2.

[35] *Id.* at ¶ 1.

[36] *Id.*

[37] *Id.* at ¶ 5.

9

\* \* \*

24.   <u>Miscellaneous</u>. . .

\* \* \*

**Arbitration.  Agreement for Arbitration.** *Company, Participant and Paul hereby agree that any dispute arising [sic] pertaining to this Agreement or its termination, shall be resolved in Dallas, Texas, by final and binding arbitration* in accordance with the Commercial Arbitration Rules of the American Arbitration Association and AAA's National Rules for the Resolution of Employment Disputes in effect on the date the dispute arises. . . .

\* \* \*

This Agreement contains the entire understanding and agreement between the parties with respect to the subject matter hereof.  *Except as otherwise provided herein, this Agreement may not be altered, amended, or rescinded, nor may any of its provisions be waived, except by an instrument in writing signed by the parties hereto or, in the case of an asserted waiver, by the party against whom the waiver is sought to be enforced.*[38]

On October 7, 2003, RGI filed a voluntary Chapter 11 petition.[39]  On Schedule D- Creditors Holding Secured Claims ("Schedule D"), RGI listed Heritage as the holder of unsecured debt totaling approximately $174,000.[40]  Heritage did not file a proof of claim.  On February 14, 2005, I confirmed RGI's plan of reorganization.

The Trustee alleges that on or about February 7, 2005, Heritage, through Ivy and Halperin, outlined the terms of a five year employment agreement (the "Employment Agreement").[41]  The material terms of the Employment Agreement included: a $55,000 monthly advance against

---

[38] Exhibit A-1, Docket No. 10, ¶¶ 4, 18, 24 (emphasis added).

[39] *See* Case No. 03-18371-WCH.

[40] Schedule D, Docket No. 16, Case No. 03-18371.

[41] Complaint, Docket No. 1, ¶ 13.

10

commissions on Paul's purchases; a $200,000 annual salary based on an average of 15 hours worked weekly plus $300 per hour for any additional hours worked; an annual bonus up to $200,000; a minimum $100,000 per year early buy-out provision in the event of a termination without cause during the five year term; and a balloon payment of $500,000 at the end of the five year term.[42] There were additional terms to the Employment Agreement and subsequent negotiations among Paul, Ivy, and Halperin.[43]   The Trustee alleges, however, that the parties orally agreed to the Employment Agreement no later than March 15, 2005, as evidenced by Heritage increasing Paul's monthly draw to $55,000.[44]

According to the Trustee, the Employment Agreement placed a number of conditions on Paul's employment with Heritage.[45]  He alleges that it required Paul to sell his Massachusetts home and establish permanent residency in Dallas, Texas, abandon all business interests, immediately settle all pending litigation, and consign personal and RGI collectible inventories to Heritage for auction.[46]  At this time, Paul was involved in a "bitterly contested" divorce proceeding, several non-bankruptcy lawsuits, and a "hotly contested" confirmation hearing in RGI's bankruptcy case.[47]  The Trustee alleges that in reliance on the generous terms of the Employment Agreement, Paul settled

---

[42] *Id.*

[43] *Id.*

[44] *Id.* at ¶ 14.

[45] *Id.* at ¶ 15.

[46] *Id.*

[47] *Id.*

11

all pending litigation on otherwise disadvantageous terms.[48]

In early April, 2005, Paul allegedly expressed concern to Heritage that it had not yet memorialized the Employment Agreement to which they had agreed and under which they had been operating.[49]   On April 5, 2005, Ivy responded by email, apologizing that the preparation of the written contract had not yet started, and assuring Paul that the delay was due to a need to seek the advice of a tax attorney in order to maximize Paul's cash flow under the Employment Agreement.[50] Paul allegedly reiterated his concern on subsequent occasions, only to be reassured each time by Ivy that the contract would be prepared soon.[51]

The Trustee alleges that Paul was provided with a written draft purporting to memorialize the Employment Agreement (the "Draft Agreement") on July 21, 2005.[52]   Although the Complaint is unclear on this point, Heritage allegedly terminated Paul a day before providing the Draft Agreement, but subsequently "changed course," presumably, rehiring him.[53]  The Trustee alleges that the Draft Agreement was materially different to the Employment Agreement to which both Heritage and Paul had agreed.[54]   In contrast, the Draft Agreement allegedly introduced many new terms and

---

[48] *Id.*

[49] *Id.* at ¶ 16.

[50] *Id.*

[51] *Id.*

[52] *Id.* at ¶ 17.

[53] *Id.*

[54] *Id.*

12

terms unfavorable to Paul.[55]  Ultimately, the parties never executed the Draft Agreement.

On September 30, 2005, Heritage, specifically identified as Heritage Galleries and Auctioneers, and Paul, with no mention of RGI, executed a document titled "Bill of Sale" (the "Bill of Sale").[56]  The Trustee alleges that Heritage required Paul to execute the Bill of Sale as a condition of his continued employment.[57]  The Bill of Sale, as submitted to the Court, is a two page document with approximately sixty pages of invoices, spreadsheets, and photocopies of coins attached.[58]  The first page of the document consists of a single paragraph of recitals followed by nine numbered sentences outlining the terms of the agreement.[59]  The Bill of Sale recites the following:

> IT IS AGRRED [sic] by and between the Parties as follows:
>
> [Heritage]'s business is that of auctioneer and dealer in collectibles. [Paul] has consigned and tendered items to [Heritage] ("Consignments") and [Paul] has received multiple advances at various dates against those consignments. [Heritage] has a perfected security interest in the Consignments. [Paul] has participated in [Heritage]'s auctions and has acquired numerous lots from [Heritage] ("Auction Purchases").  All of the Consignments and Auction Purchases were made for the [Paul]'s personal account. [Paul] owns clear title to all Consignments and has not otherwise pledged his Auction Purchases. [Heritage] has possession of the [Paul]'s Auction Purchases and the Consignments. [Heritage] retains title to the Auction Purchases to such date of the full payment for such purchases. *[Heritage] is a secured party on the Auction Purchases under the terms of its sales to which [Paul] as an auction purchaser has agreed. [Paul] has not paid for his Auction Purchases ("Debt").  The Parties desire to settle any and all issues pertaining to the Consignment, Advances and Debt.*[60]

---

[55] *Id.*

[56] Exhibit A-1, Docket No. 2.

[57] Complaint, Docket No. 1, ¶ 27.

[58] Exhibit A-1, Docket No. 2.

[59] *Id.*

[60] *Id.* (emphasis added).

13

The second page of the Bill of Sale contains only two undated signature lines where Paul, in his

individual capacity, and Ivy, as co-chairman of Heritage Auctions, Inc., executed the document.[61]

The Trustee maintains that the Bill of Sale as produced by Heritage and submitted to the

Court is incomplete and has been manipulated.[62] Paul, for reasons explained below, does not have

his own copy of the Bill of Sale. Notably, the first page of the Bill of Sale identifies "Heritage

Galleries and Auctioneers" as a party to the agreement, but the signature line on page two indicates

that Ivy signed on behalf "Heritage Auctions, Inc."[63] The Trustee also points out that several of the

documents currently attached to the Bill of Sale have a "run date" of October 7, 2005, and therefore

could not have been attached on September 30, 2005.[64] I also note that the word "advances" is

capitalized in the final sentence of the above paragraph as if it were an identified term, but it is not

identified in any part of the document, nor is it referenced further.[65]

The parties also disagree as to the purpose of the Bill of Sale. Heritage maintains that the Bill

of Sale constituted an outright sale of coins and memorabilia that Paul had either previously

purchased at Heritage's auction and not yet paid for or consigned to Heritage.[66] The Trustee alleges

that the Bill of Sale was meant to be an accounting mechanism reflecting the Heritage's purchase

of an interest in the scheduled items for $50,000 so that it could resell them and receive a twenty-five

---

[61] *Id.*

[62] Complaint, Docket No. 1, ¶ 24.

[63] Exhibit A-1, Docket No. 2.

[64] *Id.*

[65] *Id.*

[66] Complaint, Docket No. 1, ¶ 22.

14

percent share of the profits.[67]   Reiterating his allegation that the Bill of Sale is incomplete, the Trustee notes that the document in its current form does not contain any terms with respect to profit sharing.[68]

Paul filed his own individual Chapter 7 case on October 14, 2005 and the Trustee was appointed Chapter 7 trustee of his estate.[69]  At the time of his filing, Paul remained employed at Heritage.  By November, 2005, however, Heritage terminated Paul's employment, allegedly without cause.[70]   Paul did not receive the severance payment allegedly required by the Employment Agreement.[71]   Moreover, Paul alleges that upon his termination, Heritage retained or sold his personal property, only some of which had been consigned.[72]  Paul estimates that his inventory at Heritage was approximately $6,000,000 in coins, the profits of which he and Heritage were to share equally.[73]  Additionally, Heritage allegedly retained some of Paul's personal effects, as well as files regarding his personal financial and legal affairs, including his various dealings with Heritage.[74]

Heritage filed two proofs of claim in Paul's Chapter 7 case.   These claims total

---

[67] *Id.* ¶ 24.

[68] *Id.*

[69] *See* Case No. 05-22881-WCH.

[70] Complaint, Docket No. 1, ¶ 18; *see also* Schedule I - Current Income of Individual Debtor(s), Docket No. 23, Case No. 05-22881-WCH ("In November, 2005, Debtor's employer, Heritage Auction Galleries, terminated its [sic] employment with the Debtor.").

[71] Complaint, Docket No. 1, ¶ 18.

[72] *Id.* at ¶ 21.

[73] *Id.* at ¶ 19.

[74] *Id.* at ¶ 21.

approximately $401,958.89.[75]  As previously stated, Heritage did not file any proofs of claim in RGI's case, but Schedule D reflects that Heritage is the holder of secured claims totaling $174,771.05.[76]  Additionally, RGI's Schedule F - Creditors Holding Unsecured Nonpriority Claims ("Schedule F"), reveals that Paul holds unsecured claims totaling $223,020.99.[77]

Paul subsequently obtained employment as a buyer for Rare Coin Wholesalers ("RCW").[78] The Trustee alleges that Paul's employment arrangement with RCW was "very lucrative," with potential annual income from commissions in excess of $700,000.[79]  Despite his employment at RCW, Paul remained dependant on Heritage as he made over ninety percent of his coin purchases at auctions, of which Heritage was the largest.[80]

On January 31, 2006, RGI moved to convert its case to one under Chapter 7.  The motion to convert stated that Paul was unable to continue RGI's business operations because, *inter alia*, Paul commenced full-time employment with a Dallas based company, presumably RCW, which required that he devote himself exclusively to the business of the employer and discontinue the business of buying and selling memorabilia.[81]  I granted the motion to convert on February 1, 2006.  The Trustee was subsequently appointed Chapter 7 trustee of RGI's estate.

---

[75] *See* Claims Nos. 13, 14, Case No. 05-22881-WCH.

[76] Docket No. 16, Case No. 03-18371-WCH.

[77] *Id.*

[78] Complaint, Docket No. 1, ¶ 30.

[79] *Id.*

[80] *Id.* at ¶ 31.

[81] Docket No. 287, ¶ 4(b), Case No. 03-18371-WCH.

16

On December 29, 2006, the Trustee filed motions in both RGI's and Paul's bankruptcy cases seeking to retain Scott Gray of the Dallas law firm of Gray & Gray as special counsel to prosecute claims against Heritage on behalf of both Debtors' estates.   While Heritage's Dallas counsel, Attorney Deirdre Ruckman of the Dallas law firm of Gardere & Wynne, had not filed a formal appearance in either case, the Trustee provided Attorney Ruckman a copy of these motions via email.[82]   Shortly thereafter, on January 10, 2007, Ivy forwarded a copy of the Trustee's email to Steve Contursi ("Contursi"), the owner of RCW and Paul's employer, with the following message (the "Email"):

> Please find attached a lovely missive from Martin's bankrupt estate(s) attorney.  Not surprisingly, we have an entirely different view of the facts than does Martin.  The reason for this email isn't to involve you in our dispute with Martin as I'm sure you have enough to deal with, *but rather it is to inform you that until said dispute is resolved Martin will not be allowed to participate in any Heritage auction.*  Clearly our dispute isn't with you.  We have a great relationship, and I see no reason why it shouldn't continue as such.  Hopefully you will appreciate the reasons we are taking this action[.] Please call or write if you have any questions.[83]

Two days later, Contursi informed Paul of the Email and terminated his employment.[84]   Todd Griffith, Contursi's associate, told Paul that he was dramatically less profitable to RCW as a result of being barred from Heritage's auctions and therefore, RCW could not continue to employ him.[85]

In addition to all his prior allegations, Paul believes Heritage is engaged in systemic fraudulent conduct and deceptive practices with respect its auctions.  Examples of this conduct

---

[82] Complaint, Docket No. 1, ¶ 32.

[83] *Id.* at ¶ 32; Exhibit B, Docket No. 2.

[84] *Id.* at ¶ 33.

[85] *Id.*

17

include: selling memorabilia to which it has no proof of ownership; improperly "reholdering" coins with major coin grading services; improperly using inside bidding information to provide selective parties with an unfair advantage; selling gradable coins at it auction without grades so that Heritage could purchase them cheaply and make a profit on the graded resale; and intentionally making its settlement and reporting paperwork confusing to limit the ability to reconcile transactions.[86]   As a result of these deceptive practices, the Plaintiffs' allege that Paul and the Debtors' estates have been economically damaged, and that Paul has suffered mental anguish, both in amounts yet to be determined.

On March 27, 2008, the Trustee commenced the present adversary proceedings by filing a twenty-five count Complaint.   In light of the procedural posture of the case, further discussion requires a brief summary of each individual count of the Complaint.   In Count I - Tortious Interference, Paul alleges that Ivy and Heritage willfully and intentionally interfered with Paul's employment relationship with RCW by sending the Email.   In Count II - Promissory Estoppel, Paul and the Trustee of his estate allege that the Defendants promised to provide Paul with certain terms and conditions of employment if he moved to Texas, wound up his business, and finalized all pending litigation, intending that he rely on such representations, but failed to provide the promised terms after Paul performed his obligations.   Alternatively, in Count III - Negligent Misrepresentation/Employment Agreement, Paul and the Trustee of his estate allege that the Defendants made the above representations recklessly and without reasonable care, leading to Paul's detrimental reliance.   In Count IV - Deceit/Employment Agreement, Paul and the Trustee of his estate repeat their allegations under Count I.   In Count V - Breach of Contract/Employment

---

[86] Complaint, Docket No. 1, ¶¶ 37-39.

18

Agreement, Paul and the Trustee of his estate allege that Heritage breached the Employment

Agreement by failing to pay him all amounts due under the agreement.  In Count VI - Breach of

Contract/Bill of Sale, Paul and the Trustee of his estate allege that Heritage failed to account for

Paul's seventy-five percent interest in the profits on items subject to the Bill of Sale.  In Count VII -

Breach of Contract/Other, the Plaintiffs allege that Heritage breached various agreements concerning

consignments, auction purchases, split coin deals, and loans with both Paul and RGI, damaging both

Debtors' estates.  In Count VIII - Breach of the Implied Covenant of Good Faith and Fair Dealing,

the Plaintiffs allege that Heritage breached the implied covenant of good faith and fair dealing arising

under the agreements concerning their various transactions, damaging both Debtors' estates.  In

Count IX - Breach of Fiduciary Duty, the Plaintiffs allege that Heritage breached fiduciary duties

owed to the Debtors under their various agreements, damaging both Debtors' estates.  In Count X -

Conversion, the Plaintiffs allege that Heritage converted property of the Debtors that is property of

one or both of the Debtors' estates.  In Count XI - Unjust Enrichment, the Plaintiffs allege that

Heritage has been unjustly enriched at the expense of the Debtor's respective estates.  Through

Count XII - Accounting, the Plaintiffs seek an accounting pursuant to 11 U.S.C. § 542(e) based on

original documentation that is exclusively in Heritage's control in order to reconcile the various

transactions among the parties.  In Count XIII - Wrongful Termination, Paul and the Trustee of his

estate allege that Heritage terminated Paul's employment in order to avoid paying him amounts

owed.  Through Count XIV - Turn Over Order, the Trustee, as Chapter 7 trustee of both Debtors'

estates, seeks an order pursuant to 11 U.S.C. § 542 directing Heritage to turn over property of the

estate currently in its possession.  In Count XV - Preference, 11 U.S.C. § 547, the Trustee of Paul's

estate alleges that Heritage is the transferee of certain transfers of interests of Paul's property, made

19

within ninety days of the commencement of Paul's bankruptcy and while Paul was insolvent, on account of an antecedent debt which enabled Heritage to receive more than it would in a case under Chapter 7 and is thus avoidable.  In Count XVI - Fraudulent Transfer, 11 U.S.C. § 548, the Trustee of both Debtors' estates asserts that property interests of one or both of the Debtors were fraudulently transferred to Heritage to the extent that the Debtors did not receive reasonably equivalent value at a time when they were insolvent due to Heritage's failure to properly credit the transfers.  In Count XVII - Uniform Fraudulent Transfer Act, Mass. Gen. Laws Ch. 109A, § 5(a)(2)(I) and Texas Business and Commercial Code, § 24.005(a)(2)(A), the Trustee of both Debtors' estates asserts that Heritage failed to credit transfers of interest from one or both Debtors at a time when one or both Debtors were engaged or were about to engage in a transaction for which the remaining assets of the Debtors were unreasonably small in comparison.  In Count XVIII - Uniform Fraudulent Transfer Act, Mass. Gen. Laws Ch. 109A, § 6(a) and Texas Business and Commercial Code, § 24.006(a), the Trustee of both Debtors' estates repeats his argument under Count XVI.  In Count XIX - Unauthorized Post-Petition Transfers, 11 U.S.C. § 549, the Trustee of both Debtors' estates alleges that some transactions were made after the commencement of the Debtors' respective bankruptcy cases and were not authorized by the Court.  Through Count XX - Recovery of Avoided Transfers, 11 U.S.C. § 550, the Trustee of both Debtors' estates seeks to recover any property transferred to Heritage or its value to the extent that any transfer is avoided.  In Count XXI - Trustee's Objection to Allowance of Claim, 11 U.S.C. § 502, the Trustee of both Debtors' estates objects to the allowance of all claims asserted or held by Heritage in the Debtors' cases.  Through Count XXII - Equitable Subordination of Claims, 11 U.S.C. § 510(c), the Trustee of both Debtors' estates seeks to subordinate the claims of Heritage on the basis of its inequitable conduct which has resulted in

20

injury to creditors or an unfair advantage to Heritage. In Count XXIII - Texas Business and Commercial Code, § 17.50, the Plaintiffs assert that while the Debtors were consumers under § 17.45 of the Texas Business and Commercial Code, the Defendants knowingly and intentionally engaged in false, misleading, or deceptive conduct upon which Paul detrimentally relied. In Count XXIV - Mass. Gen. Laws Ch. 93A, § 11, the Plaintiffs assert that each Defendant is engaged in trade or commerce and have committed unfair and deceptive acts and practices. Through Count XXV - Declaratory Judgment, the Plaintiffs seek a declaration of the parties' rights regarding the claims asserted, particularly with respect to any property belonging to the estate of either Debtor.

On April 28, 2008, the Defendants filed the Motion to Compel and a supporting memorandum of law. After numerous continuances, the Trustee filed the Plaintiffs' Opposition to Motion to Dismiss or Stay and Compel Arbitration (the "Opposition") on August 22, 2008.[87] On August 26, 2008, the Defendants filed a Reply in Support of the Motion to Compel (the "Reply"). I conducted hearing on the Motion to Compel on August 27, 2008, at the conclusion of which, I took the matter under advisement. At the hearing, the parties declined the opportunity to further brief the issues now before the Court.

## III. POSITIONS OF THE PARTIES

### A. The Defendants

The Defendants move to dismiss, or alternatively stay, the present adversary proceedings and compel arbitration of the parties' dispute in Dallas, Texas, pursuant to the broad language of the various arbitration agreements between them. They argue that these various agreements cover all

---

[87] The Motion to Compel was originally scheduled for hearing on May 21, 2008, but the parties continued the hearing several times by agreement to afford the Trustee an opportunity to analyze and respond to the Motion to Compel.

causes of action, whatever their nature.  Specifically, the Defendants assert that the Plaintiffs'

consent to the arbitration of these issues is evidenced by: 1) Paul's execution of the Participation

Agreement which includes a broad arbitration clause; 2) Paul's participation in Heritage auctions

under the Standard Auction Terms; 3) Paul's online registration with Heritage's internet auction site

under its terms and conditions; 4) Paul's execution of the Bill of Sale which references the Standard

Auction Terms; 5) the multiple invoices attached to the Complaint which state, "I have read and

agree to the Terms and Conditions of Sale as they appear in the Catalogue;" 6) Paul's execution of

the Consignment Agreement under the Consignment Terms; 7) Paul's execution of the Extended

Payment Terms; and 8) Paul's execution of the Bullet Auction Document under the Terms of Sale.

The Defendants contend that because these agreements involve interstate commerce and expressly

state that the Federal Arbitration Act[88] (the "FAA") applies, arbitration is mandatory under the

FAA.[89]

      The Defendants maintain that all claims contained within the Complaint fall within an

enforceable arbitration agreement.  They argue that the United States Court of Appeals for the First

Circuit broadly interprets arbitration agreements which cover claims "arising from" or "relating to"

an agreement to encompass both breach of contract claims and any tort or other claims related to the

agreements.[90]  Moreover, the Plaintiffs are equitably estopped from litigating claims otherwise

arbitrable simply because Ivy and Halperin are not signatories of the agreements.[91]  To the extent that

---

[88] 9 U.S.C. § 1 *et. seq.*

[89] *See* 9 U.S.C. § 2.

[90] *See, e.g., McCarthy v. Azure*, 22 F.2d 351 (1st Cir. 1994).

[91] *Sourcing Unlimited, Inc. v. Asimco Int'l. Inc.*, 526 F.3d 38 (1st Cir. 2008).

22

the Plaintiffs assert that the Bill of Sale superceded any prior agreement, including the Participation

Agreement and Standard Auction Terms, the Defendants disagree and contend that nothing in the

Bill of Sale purports to amend, supercede, or supplant the terms of any other agreement.   To the

contrary, the Defendants argue that the Bill of Sale expressly references the Standard Auction Terms

and by signing the Bill of Sale, Paul reaffirmed his consent to the mandatory arbitration provision.

Further, even assuming, *arguendo*, that the Bill of Sale superceded the parties' prior agreements, the

Defendants rely on several cases for the proposition that an arbitration clause remains effective

absent a specifically manifested intent to rescind the arbitration clause itself.[92]   Similarly, the

Defendants assert that the Employment Agreement could not have rescinded the Participation

Agreement's arbitration clause because oral modifications are ineffective under the express terms

of the Participation Agreement.

　　Citing  *Shearson/Am. Express, Inc. v. McMahon*,[93] the Defendants argue that to overcome

the strong federal policy in favor of arbitration, the Plaintiffs must prove that there is an

irreconcilable conflict between the FAA and the underlying purpose of the Bankruptcy Code.[94]

Moreover, they rely on a number of cases for the proposition that a bankruptcy court has no

discretion to refuse to compel arbitration of matters not involving core bankruptcy proceedings as

---

[92] *Nolde Brothers, Inc. v. Local No. 358*, 430 U.S. 243, 255 (1977); *Riley Mfg. Co., Inc. v. Anchor Glass Container Corp.*, 157 F.3d 775, 781 (10th Cir. 1998); *Homestake Lead Co. of Missouri v. Doe Run Resources Corp.*, 282 F.Supp.2d 1131, 1142 (N.D. Cal. 2003); *Berkery v. Cross Country Bank*, 256 F.Supp.2d 359, 368-369 (E.D. Pa. 2003).

[93] *Shearson/Am. Express , Inc. v. McMahon*, 482 U.S. 220, 227 (1987).

[94] 11 U.S.C. § 1 *et. seq.*

23

no irreconcilable conflict arises.[95]  Here, the Defendants assert that the breach of contract and related

state law tort claims arising from either the auction purchase and sales transactions conducted

between the parties on an independent contract basis or the alleged employment contract between

Heritage and Paul must be arbitrated because they are non-core claims which are not created by or

rely on provisions of the Bankruptcy Code.  The Defendants note that arbitration of such claims

remains mandatory even when pursued by a trustee in bankruptcy.[96]

Additionally, the Defendants argue that the fraudulent transfer and recovery-related causes

of action arising under the Bankruptcy Code must also arbitrated for several reasons.  First, the

Defendants assert that any "ancillary" causes of action that implicate the Bankruptcy Code should

be considered non-core because they are merely derivative of the underlying contractual dispute and

seek to vindicate the same rights. Second, even if such causes of action are core, they still must be

arbitrated unless the Plaintiffs establish that arbitration "severely conflicts" with the purposes of the

Bankruptcy Code.[97]  In the present case, the Defendants contend that there is no conflict between

arbitration and the objectives of the Bankruptcy Code as the arbitration proceeding may be promptly

commenced, discovered, and concluded without unduly delaying the administration of the Debtors'

estates.  Moreover, the few ancillary bankruptcy claims asserted require no specialized knowledge

---

[95] *See Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1156-61 (3rd Cir. 1989); *Merrill v. MBNA Am. Bank, N.A. (In re Merrill)*, 343 B.R. 1, 11 (Bankr. D. Me. 2006); *Bezanson v. Consolidated Contructors & Builders (In re P & G Drywall and Acoustical Corp.)*, 156 B.R. 704, 706 (Bankr. D. Me. 1993).

[96] *Id.*

[97] *See The Whiting-Turner Contracting Co. v. Elec. Mach. Enters., Inc. (In re Elec. Mach. Enters., Inc.)*, 479 F.3d 791 (11th Cir. 2007); *Mintze v. Am. Gen. Fin. Servs., Inc. (In re Mintze)*, 434 F.3d 222 (3rd Cir. 20006); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056 (5th Cir. 1997).

24

and can be readily adjudicated based on common factual findings.  To the extent that I find that any

claims should resolved in the bankruptcy court, the Defendants request that I stay any proceedings

with respect to those claims and compel arbitration of the remaining claims in accordance with the

parties' agreements.

In addition to the numerous legal reasons for compelling arbitration, the Defendants assert

that it will also be equitable as the Trustee is the only party located in Massachusetts, while all the

other parties, witnesses, and evidence are already located in Dallas, Texas.

In the alternative, the Defendants argue that the Plaintiffs' fraud based claims should be

dismissed under Fed. R. Civ. P. 9(b), made applicable to adversary proceedings by Fed. R. Bankr.

P. 7009, because they are not plead with particularity.  The Defendants argue that Fed. R. Civ. P.

9(b) requires that Plaintiffs plead specific facts to establish the "who, what, where, and when" of the

alleged fraud by each defendant.[98]  Specifically, the Defendants note that none of the Plaintiffs' fraud

claims specify the role of each Defendant in the alleged fraudulent acts.  Additionally, the Plaintiffs'

allegations do not identify where and when the alleged fraudulent representations took place.

Moreover, the fraudulent transfer allegations fail to identify what property is involved, or where and

when it was allegedly transferred.  In the event that I deny the request to dismiss, the Defendants

request an additional ten days to answer the Complaint pursuant to Fed. R. Civ. P. 12(a)(4).

B. The Trustee

The Trustee disputes that any applicable arbitration agreement remains in effect.  First, the

Trustee argues that the Participation Agreement was superceded by the Employment Agreement,

which had no arbitration clause.  Moreover, any amounts that were left outstanding under the

---

[98] *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.*, 374 F.3d 23, 29 (1st Cir. 2004).

Participation Agreement were "rolled into" the Employment Agreement.  Second, the Trustee

similarly asserts that the Standard Auction Terms was superceded by the Bill of Sale.  To the extent

that the Defendants rely on other documents, such as the Consignment Agreement, the Bullet

Auction Agreement, and the Extended Payment Terms, the Trustee asserts that the Defendants have

failed to indicate what items these documents relate to and whether the transactions remain

outstanding.  To the extent that they relate to any unpaid auction purchases, the Trustee argues that

they were closed out by the Bill of Sale, which he notes does not contain an arbitration clause.  Even

assuming, *arguendo*, that these arbitration clauses remain in effect, the Trustee argues that the

Defendants have failed to demonstrate what specific transactions, if any, they encompass.

Additionally, the Trustee notes that many of the Plaintiffs' claims were brought in the name of the

Trustee, or against Ivy and Halperin, none of whom are parties to any arbitration agreement.

The Trustee relies on *In re Winimo Realty Corp.*[99] for the proposition that where a Defendant

files a proof of claim and thus seeks the benefit of the bankruptcy court's jurisdiction, the entire

matter, even if based on a pre-petition contract claim, is deemed core.  This is because the adversary

proceeding would affect the allowance or disallowance of the creditor's claim.  As such, the Trustee

asserts that all the Plaintiffs' breach of contract claims are core proceedings.  In contrast to the

Defendants, the Trustee asserts that bankruptcy courts retain discretion to decide whether to compel

arbitration of core matters.[100]  The Trustee contends that compelling arbitration here would not serve

the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and

---

[99] *Cibro Petroleum Products, Inc. v. Albany (In re Winimo Realty Corp.)*, 270 B.R. 108
(S.D.N.Y. 2001).

[100] *Brown v. Mortgage Elec. Registration Sys., Inc. (In re Brown)*, 354 B.R. 591 (D.R.I.
2006).

26

reorganizing debtors from piecemeal litigation, or the undisputed power of the bankruptcy court to

enforce its own orders.[101]   The Trustee also argues that the need for Court supervision of the

discovery process militates against compelling arbitration where key documentation is in the

Defendants' possession and there are allegations of misconduct.

With respect to the Defendants' motion to dismiss claims under Fed. R. Civ. P. 9(b), the

Trustee contends that the allegations give the Defendants adequate notice to allow them to respond

to the Complaint.[102]   While the allegations may not provide the specific who, what, when, and where,

the Trustee argues that the Complaint is sufficiently particular to suggest that the suit is not frivolous.

The Trustee also notes that pleading fraud with more specificity would be difficult without further

discovery as the key documentary evidence in the case is currently under the Defendants' control.

In the event I find fraud was not plead sufficiently, the Trustee requests an opportunity to amend the

Complaint.

## IV. <u>DISCUSSION</u>

A. <u>Arbitration</u>

1.  The Standard of the Review for the Motion to Compel

The Supreme Court of the United States has alternatively described arbitration clauses as

"contractual choice-of-forum provisions," or "a specialized kind of form-selection clause."[103]   The

United States Court of Appeals for the First Circuit has held that dismissal of a complaint based on

---

[101] *See Cavanaugh v. Conseco Fin. Serv. Corp. (In re Cavanaugh)*, 271 B.R. 414 (Bankr. D. Mass. 2001).

[102] *Frontier Mgmt. Co. v. Balboa Ins. Co.*, 658 F.Supp. 987 (D. Mass. 1986).

[103] *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 615 (1985); *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1964).

a forum selection clause falls under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which

relief can be granted, stating that a forum selection clause "merely constitutes a stipulation in which

the parties join in asking the court to give effect to their agreement by declining to exercise its

jurisdiction."[104]   Therefore, I must treat the Motion to Compel procedurally as one for dismissal

under Fed. R. Civ. P. 12(b)(6).  For purposes of this case, this means I must accept as true all well

pleaded factual allegations of the Complaint.[105]   Moreover, as the agreements attached to the

Complaint and the Motion to Compel are "matters fairly incorporated within [the Complaint]," I

need not apply a summary judgment standard.[106]

2.  The Standard for Enforcing an Applicable Arbitration Clause

The FAA provides that arbitration agreements "shall be valid, irrevocable, and enforceable,

save upon such grounds as exist at law or in equity for the revocation of any contract."[107]  It further

provides that the court, "upon being satisfied that the issue involved in such suit or proceeding is

referable to arbitration under such an agreement, shall on application of one of the parties stay the

trial of the action until such arbitration has been had in accordance with the terms of the agreement

. . . ."[108]  "The Supreme Court of the United States has long recognized that 'federal statutory claims

---

[104] *LFC Lessors, Inc. v. Pacific Sewer Maintenance Corp.*, 739 F.2d 4, 6-7 (1st Cir. 1984); *see also Lambert v. Kysar.* 983 F.2d 1110, 1112 n. 1 (1st Cir. 1993).

[105] *Braunstein v. Panagiotou (In re The McCabe Group, P.C.)*, Adv. P. No. 06-1242, 2006 WL 2604685 *3 (Bankr. D. Mass. Sept. 11, 2006).

[106] *See Banco Santander de Puerto Rico v. Lopez-Stubbe ( In re Colonial Mortgage Bankers Corp)*, 324 F.3d 12, 16 (1st Cir. 2003).

[107] 9 U.S.C. § 2.

[108] 9 U.S.C. § 3.

28

can be appropriately resolved through arbitration, and [has] enforced agreements to arbitrate that

involve such claims.'"[109]  To determine whether statutory claims are arbitrable, the Supreme Court

of the United States articulated the following two part inquiry in *Randolph*:

> In determining whether statutory claims may be arbitrated, we first ask whether the
> parties agreed to submit their claims to arbitration, and then ask whether Congress
> has evinced an intention to preclude a waiver of judicial remedies for the statutory
> rights at issue.[110]

By resisting the Motion to Compel, the Plaintiffs bear the burden of showing that Congress intended

to preclude a waiver of judicial remedies for the statutory rights at issue.[111]

The United States Court of Appeals for the First Circuit has held that courts may presume

that parties have committed to arbitration of a dispute where the parties have entered into a valid

arbitration agreement and the arbitration agreement covers the subject matter of the underlying

dispute between them.[112]  Any doubts concerning the scope of arbitrable issues should be resolved

in favor of arbitration.[113]

With respect to the second prong of the *Randolph* test, the Supreme Court of the United

States in *McMahon* set forth the following standard:

> If Congress did intend to limit or prohibit a waiver of judicial forum for a particular
> claim, such an intent 'will be deducible from [the statute's] text or legislative

---

[109] *In re Merrill*, 343 B.R. at 5 (*quoting Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79, 89 (2000)).

[110] *Randolph*, 531 U.S. at 90.

[111] *McMahon*, 482 U.S. at 227; *In re Cavanaugh*, 271 B.R. at 421.

[112] *Nat'l Cas. Co. v. First State Ins. Group*, 430 F.3d 492, 500 (1st Cir. 2005); *Painewebber Inc. v. Elahi*, 87 F.3d 589, 599 (1st Cir. 1996).

[113] *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

29

history,' . . . or from an inherent conflict between arbitration and the statute's underlying purposes.[114]

Applying these principles, courts have generally accepted that bankruptcy courts have no discretion to refuse to compel the arbitration of non-core matters, as they are unlikely to present a conflict sufficient to override the presumption in favor of arbitration.[115]  Courts applying the same approach to core matters, however, have reached "widely-divergent conclusions both with respect to what qualifies as an 'inherent conflict,' and what constitutes 'interference' in the administration of the estate."[116]

In *In re White Mountain Mining Co., L.L.C.*,[117] the United States Court of Appeals for the Fourth Circuit held that the bankruptcy court did not abuse its discretion by refusing to enforce an international arbitration agreement in a Chapter 11 bankruptcy case.  Finding an inherent conflict between arbitration and the underlying purposes of bankruptcy laws in an action seeking a declaration as to whether pre-petition cash advances were debt or equity, the court stated:

> "[T]he very purpose of bankruptcy is to modify the rights of debtors and creditors," and Congress intended to centralize disputes about a debtor's assets and legal obligations in the bankruptcy courts.  Arbitration is inconsistent with centralized decision-making because permitting an arbitrator to decide a core issue would make debtor-creditor rights "contingent upon an arbitrator's ruling" rather than the ruling

---

[114] *McMahon*, 482 U.S. at 227 (*quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 627 (1985))

[115] *See In re Elec. Mach. Enters., Inc.*, 479 F.3d at 796; *Crysen/Montenay Energy Co. v. Shell Oil (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160 (2d Cir. 2000); *In re Nat'l Gypsum Co.*, 118 F.3d at 1064; *Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d at 1152; *MCI Telecommunications Corp. v. Gurga (In re Gurga)*, 176 B.R. 196 (B.A.P. 9th Cir. 1994).

[116] *In re Brown*, 354 B.R. at 599.

[117] *Phillips v. Congelton, L.L.C. (In re White Mountain Mining Co., L.L.C.)*, 403 F.3d 164 (4th Cir. 2005).

30

of the bankruptcy judge assigned to hear the debtor's case.[118]

While heavily influenced by the core/non-core distinction, the Fourth Circuit stopped short of holding that the bankruptcy court's core jurisdiction, by itself, reveals a congressional intent to choose those courts in exclusive preference to all other adjudicative bodies to decide core claims.[119] In *In re Brown*, however, the United States District Court for the District of Rhode Island held that where a conflict exists between the Bankruptcy Code and the FAA, the bankruptcy court retains discretion to decide whether to compel arbitration of a core matter.[120]   Recognizing what it characterized as a conflict of "polar extremes" between the purpose of Bankruptcy Code and the FAA, the district court concluded that the core/non-core distinction represented the best approach for resolving conflicts because it creates a bright-line test while heeding *McMahon*'s directive.[121]

In contrast, the United States Court of Appeals for the Fifth Circuit stated:

> [W]e believe that nonenforcement of an otherwise applicable arbitration provision turns on the underlying nature of the proceeding, i.e., whether the proceeding derives exclusively from the provisions of the Bankruptcy Code and, if so, whether the arbitration of the proceeding would conflict with the purposes of the Code.
>
> * * *
>
> The core/non-core distinction conflates the inquiry set forth in *McMahon* and *Rodriguez* [*de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989)] with the mere identification of the jurisdictional basis of a particular bankruptcy proceeding. Certainly not all core bankruptcy proceedings are premised on provisions of the Code that "inherently conflict" with the Federal Arbitration Act; nor would

---

[118] *In re White Mountain Mining Co., L.L.C.*, 403 F.3d at 169 (*quoting* 1 Collier on Bankruptcy,¶ 3.02[2] (15th ed. rev.2005)) (citations omitted).

[119] *Id.*

[120] *In re Brown*, 354 B.R. at 603.

[121] *Id.* at 594, 603.

31

arbitration of such proceedings necessarily jeopardize the objectives of the Bankruptcy Code. Although, as appellees suggest, "the core/non-core distinction is a practical and workable one," it is nonetheless too broad. The "discretion" . . . should exist only where a particular bankruptcy proceeding meets the standard for nonenforcement of an arbitration clause set forth in *McMahon* and *Rodriguez*.

\* \* \*

[D]istinguishing between those actions derived from the debtor and those created by the Bankruptcy Code explains the consistent reluctance to permit arbitration of actions brought to adjudicate bankruptcy rights. There can be little dispute that where a core proceeding involves adjudication of federal bankruptcy rights wholly divorced from inherited contractual claims, the importance of the federal bankruptcy forum provided by the Code is at its zenith. Arguably, these actions are simply beyond the coverage of most, if not all, arbitration provisions. But, assuming an otherwise applicable arbitration provision, the adjudication of these actions outside the federal bankruptcy forum could in many instances present the type of conflict with the purpose and provisions of the Bankruptcy Code alluded to in *McMahon. See Hays*, 885 F.2d at 1155 ("Claims asserted by the trustee under section 544(b) are not derivative of the bankrupt. They are creditor claims that the Code authorizes the trustee to asset on their behalf."); *In re Barney's Inc.*, 206 B.R. 336 (Bankr. S.D.N.Y. 1997) (finding Chapter 11 debtor's section 544(a) avoidance action, section 549 avoidance action, and section 542 turnover action were not subject to arbitration); *In re Dunes Hotel Associates*, 194 B.R. 967, 992 (Bankr.D.S.C.1995) (finding Chapter 11 debtor's section 544(a) avoidance action, section 542 turnover action, and section 365 rejection action were not subject to arbitration); *In re Arentson*, 126 B.R. 236, 238 (Bankr. N.D. Miss.1991) (refusing to order arbitration of a wrongful termination action brought by a Chapter 7 debtor under section 525(b), which provides redress for discrimination against an individual because of a bankruptcy filing, because it was a cause of action "exclusively related to a bankruptcy statute ... that literally begs for resolution in a bankruptcy forum"); *cf. In re Pate*, 198 B.R. 841, 846 (Bankr. S.D. Ga. 1996) (finding Chapter 13 debtor's Federal Truth in Lending Act claim involving the financing of a mobile home, which was core under 28 U.S.C. § 157(b)(2)(C) (counterclaims by the debtor's estate), was arbitrable).

We think that, at least where the cause of action at issue is not derivative of the pre-petition legal or equitable rights possessed by a debtor but rather is derived entirely from the federal rights conferred by the Bankruptcy Code, a bankruptcy court retains significant discretion to assess whether arbitration would be consistent with the purpose of the Code, including the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its

32

own orders.[122]

The analysis set forth in *In re Nat'l Gypsum Co.* has been adopted by a the United States Court of Appeals for the Second, Third, Fifth, and Eleventh Circuits, as well as bankruptcy courts within this circuit.[123]  As this reasoning best explains the application of the Supreme Court's standard set forth in *McMahon*, I will follow suit and adopt this rationale as well.  While use of the core/non-core distinction has superficial appeal, it is ultimately too broad as it fails to consider that not all core proceedings are premised on provisions of the Bankruptcy Code that "inherently conflict" with the FAA.  In contrast, the *In re Gypsum Co.* analysis strikes the correct balance between the relevant considerations by focusing on the underlying nature of the proceeding.

3.  Whether the Parties Agreed to Submit Their Claims to Arbitration

As previously stated, I may presume the parties have committed to the arbitration of a dispute where they have entered into a valid arbitration agreement and the dispute falls within the scope of the arbitration clause.  It cannot be fairly disputed that at one time the parties agreed to arbitrate certain matters between them.  This is evidenced by the Consignment Terms, the Extended Payment Terms, the Bullet Auction Document, the Terms of Sale, the Standard Auction Terms, and the Participation Agreement.  The Trustee concedes this point, but disputes the continued validity and/or applicability of these agreements.

The Trustee argues that on September 30, 2008, all outstanding transactions were included in the Bill of Sale, which does not contain an arbitration clause, superceding all prior agreements

---

[122] *In re Nat'l Gypsum Co.*, 118 F.3d at 1067-1069.

[123] *See In re Elec. Mach. Enters., Inc.*, 479 F.3d at 796; *In re Mintze*, 434 F.3d at 231; *In re Crysen/Montenay Energy Co.*, 226 F.3d at 166; *Gandy v. Gandy (In re Gandy)*, 299 F.3d 489, 495 (5th Cir. 2002); *In re Merrill*, 343 B.R. at 9; *In re Cavanaugh*, 271 B.R. at 424-426.

related to those transactions and rendering them non-arbitrable.  I disagree as "the well settled jurisprudence . . . holds arbitration agreements to a life and validity separate and apart from the agreement in which they are embedded."[124]  The Supreme Court of the United States held that "where the dispute is over a provision of the expired agreement, the presumptions favoring arbitrability must be negated expressly or by clear implication."[125]  "If a post-expiration claim 'arises under' the expired contract, . . . then the agreement to arbitrate survives expiration, but only with respect to that claim."[126]  The Supreme Court further explained:

> A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, where an action taken after expiration infringes a right that accrued or vested under the agreement, or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.[127]

In the present case, there is no language in the Bill of Sale which expressly negates any prior arbitration clauses and therefore, I must presume their validity was unaffected by the Bill of Sale transaction.  Similarly, the Trustee's argument that the Employment Agreement, which contains no agreement to arbitrate, supercedes the Participation Agreement fails for the same reasons.

Having disposed of the Trustee's initial arguments, I must now consider whether the parties' dispute falls within the scope of a valid arbitration clause.  This question is complicated by the

---

[124]  *Berkery*, 256 F.Supp.2d at 368. *See also Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 205-206 (1991); *Nolde Brothers, Inc.*, 430 U.S. at 255; *Koch v. Compucredit Corp.*, No. 07-1948, 2008 WL 4305903 (8th Cir. Sept. 23, 2008); *Riley Mfg. Co., Inc.*, 157 F.3d at 781; *Homestake Lead Co. of Missouri*, 282 F.Supp.2d at 1140.

[125]  *Nolde Brothers, Inc.*, 430 U.S. at 255.

[126]  *Hinnant v. Am. Ingenuity, LLC*, 554 F.Supp.2d 576, 583 (E.D. Pa. 2008).

[127]  *Litton Fin. Printing Div.*, 501 U.S. at 205-206 (1991).

Trustee's generalized allegations with respect to thousands of individual transactions and the

Defendants reliance on several agreements without identifying the transactions subject to these

agreements.   To illustrate the problem, transaction specific agreements, like the Consignment

Agreement or Extended Payment Terms, are too narrow as they apply only to specific sales without

further reference to what was purchased, sold, or consigned.   Others, like the Terms of Sale or the

Standard Auction Terms, are too broad in as much as each could have applied to every transaction

between the parties or none.   Terms, by themselves, are not a contract.   In order for them to be an

agreement, the parties must mutually agree to apply them to a specific transaction.   The Defendants'

assertion that Paul agreed to the Standard Auction Terms by bidding or otherwise participating at

Heritage's auction is insufficient without first demonstrating that Paul bid or otherwise participated

at an auction subject to the Standard Auction Terms.

In this case, the Participation Agreement represents the most encompassing agreement with

respect to auction related transactions.   The Participation Agreement sets forth the terms by which

Heritage and Paul, as an independent contractor, would engage in the purchase, resale, and

conservation of numismatic items.[128]  These terms included how the parties would share the profits

from resold numismatic items and Paul's right to an accounting of his purchases.[129]  Paragraph 18

of the Participation Agreement is a merger clause which acknowledges that the parties had

previously entered into a series of transactional agreements and indicates that "[a]ny and all prior

agreements of the parties with respect to the subject matter hereof, whether oral or in writing, are

---

[128] Exhibit A-1, Docket No. 10, ¶¶ 1-2.

[129] *Id.* ¶¶ 5, 9.

superceded by the terms of this Agreement."[130]  As such, all outstanding transactions prior to May

1, 2003, became subject to the Participation Agreement.  Moreover, the automatic renewal

provisions of the Participation Agreement provided that it would automatically renew every six

months until terminated by either party.[131]  Here, the Participation Agreement would have terminated

roughly around November, 2005, when Heritage terminated Paul's employment.  This means that

all auction transactions up to November, 2005, were subject to the Participation Agreement and the

arbitration clause contained therein.

The Participation Agreement's arbitration clause provides in relevant part:

> **Arbitration.  Agreement for Arbitration.**  *Company, Participant and Paul hereby
> agree that any dispute arising [sic] pertaining to this Agreement or its termination,
> shall be resolved in Dallas, Texas, by final and binding arbitration* in accordance
> with the Commercial Arbitration Rules of the American Arbitration Association and
> AAA's National Rules for the Resolution of Employment Disputes in effect on the
> date the dispute arises. . . .[132]

Construing this arbitration clause liberally, as I am bound to do, I conclude that all disputes relating

to the purchase, sale, resale, accounting, and profit sharing with respect to transactions involving

numismatic items prior to November, 2005, are within the scope of this arbitration clause.

Moreover, any dispute with respect to Paul's compensation as an *independent contractor* would also

fall within the scope of the Participation Agreement's arbitration clause.

Notably, the Participation Agreement makes no reference to memorabilia.  The Bill of Sale,

however, purports to transfer title to goods listed on the attached schedules.  Four invoices attached

---

[130] *Id.* ¶ 18.

[131] *Id.* ¶ 4.

[132] *Id.* at ¶ 24 (italics added, bold in original).

36

to the Bill of Sale describe various items of memorabilia. While the Trustee argues that these invoices have a "run date" of October 7, 2005, after the execution of the Bill of Sale, these invoices clearly have transaction dates prior to September 30, 2005. The "run date" is likely when these invoices were printed and not when the sale took place. As previously stated, each contain the following acknowledgment: "I have read and agree to the Terms and Conditions of Sale as they appear in the catalogue." Assuming that the Terms of Sale is the document referenced by the invoices, these items would be subject to the following arbitration clause:

> If any disputes arise regarding payment, authenticity, or grading or any other matter pertaining to the sale, the bidder or a participant in the Auction Sale and/or the Auctioneer agree that the dispute shall be submitted . . . to binding arbitration . . . in Dallas, Texas. . . .[133]

I note, however, that only memorabilia specifically identified in those four invoices are subject to this arbitration clause.

Having determined the scope of the applicable arbitration clauses, it appears that several disputes between the parties fall outside the scope of any arbitration agreement. First, there clearly is no agreement to arbitrate Paul's claim for tortious interference. There is simply nothing before me that explains the nature of Paul's participation in Heritage's auctions after his termination. As Paul's status as an independent contractor under the Participation Agreement was terminated by November, 2005, its provisions cannot apply actions taken against him, as an employee of RCW, in January, 2007. As such, Count I is not arbitrable.

Second, the Plaintiffs' claims for promissory estoppel, negligent misrepresentation, deceit, breach of the Employment Agreement, and wrongful termination do not fall within the scope of any

---

[133] *Id.* at ¶ 16.

37

arbitration clause.  The allegations underlying these claims all relate to Paul's compensation under the Employment Agreement.   There is no allegation that the parties agreed to arbitrate disputes arising under the Employment Agreement.  Moreover, contrary to the Defendants' argument, the Employment Agreement is not an impermissible oral alteration, amendment, rescission, or waiver of the Participation Agreement.   Accepting the Trustee's allegations as true, the Employment Agreement was a new distinct agreement between the parties with respect to Paul's compensation and status as an employee of Heritage.  As the Participation Agreement outlines the terms of Paul's independent contractor status and relationship with Heritage, the Employment Agreement supercedes those provisions and is not subject to the arbitration clause.  I note, however, that the Employment Agreement, as described, does not reference  the purchase, sale, resale, accounting, or profit sharing with respect to any items, and therefore those matters remain subject to prior agreements. Accordingly, Counts II, III, IV, V, and XIII are not arbitrable.

Third, the Plaintiffs' claims under Texas Bus. & Com. Code Ann. § 17.50 and Mass. Gen. Laws Ch 93A, § 11, largely fall outside the scope of any arbitration clause.  With perhaps the exception of Paul's allegation that Heritage's settlement documentation is purposefully confusing, which could fall within the scope of the Participation Agreement as it contemplates accounting and reconciliation, the remainder of these allegations are not contractually based.  Instead, they are allegations of systemic fraud with respect to Heritage's business practices not expressly linked to any particular transaction.[134]  As such, Counts XXIII and XXIV are not arbitrable.

Finally, to the extent that any other count of the Complaint concerns a dispute regarding: 1)

---

[134] I note, however, that the Plaintiffs' failure to connect these allegations to specific transactions involving Paul or RGI may ultimately speak to whether or not they were damaged by such "systemic fraud."

the purchase, sale, resale, accounting, or profit sharing with respect to items involved in transactions

after November, 2005, 2) memorabilia not listed on the four invoices, and 3) deceptive practices not

contemplated by the Participation Agreement (1, 2, and 3 collectively, the "Non-Covered

Transactions"), there is nothing before me to demonstrate that they fall within an existing arbitration

clause. Even if the Non-Covered Transactions were incorporated into the Bill of Sale, I find that

there is nothing on the face of that document to suggest that it incorporates an arbitration clause. The

Defendants' reliance on the phrase "[Heritage] is a secured party on the Auction Purchases *under

the terms of its sales to which [Paul] as an auction purchaser has agreed*," is misplaced. First, in

order for the Bill of Sale to incorporate the whole "terms of its sales," that phrase would need to

modify "Auction Purchases, " rather than "secured party on the Auction Purchases." While this

document is poorly drafted, such a reading of the sentence is ungrammatical. The clear import of

the sentence's construction is that "terms of its sale" modifies "secured party on the Auction

Purchases," indicating that the "terms of its sale" further defines Heritage's secured status. Second,

the "terms of its sale" is not an identified term in the agreement and is ambiguous in light of

Heritage's use of both the Terms of Sale and Standard Auction Terms. While currently there is no

basis to find the Non-Covered Transactions arbitrable, it is possible such a basis may be found upon

further discovery.[135]

      The Trustee's assertion that neither he, nor Ivy and Halperin, are parties to any arbitration

agreement is unavailing. When stepping into the shoes of the Debtors, the Trustee is equally bound

---

[135] As will be discussed in the next section, a trial on the discrete issue of whether the
Non-Covered Transactions do in fact fall within the scope of an arbitration clause is not
necessary.

to arbitrate causes of action derivative of the Debtors.[136]  It is also irrelevant that Ivy and Halperin

are not signatories of the arbitration agreements as the United States Court of Appeals for the First

Circuit has held that non-signatories may enforce an arbitration agreement against a signatory.[137]  In

sum, all disputes in Counts VI through XII, XXV (collectively, the "Contract Claims") other than

those with respect to the Non-Covered Transactions, and Counts XIV through XXII (collectively,

the "Bankruptcy Claims") have met the first prong of the *Randolph* test.

### 4.  Whether an "Inherent Conflict" Exists

Turning now to the second prong of the *Randolph* test, I must follow the *McMahon* standard

and determine whether there is an inherent conflict between arbitration and the Bankruptcy Code's

underlying purpose.  Having adopted the Fifth Circuit's rationale from *In re Nat'l Gypsum Co.*, I

must look to the underlying nature of the proceeding and determine whether the proceeding derives

exclusively from the provisions of the Bankruptcy Code, and if so, whether arbitration would conflict

with the purpose of the Bankruptcy Code.[138]  If such a conflict exists, I have discretion to refuse to

compel the arbitration of the Covered Transactions.  Noting that "the importance of the federal

bankruptcy forum provided by the Code is at its zenith" in "actions brought to adjudicate bankruptcy

rights," I will begin my analysis with the Trustee's claims brought under the Bankruptcy Code.[139]

The avoidance claims brought by the Trustee under 11 U.S.C. §§ 547, 548, 549, and 550 are

---

[136] *See Hays*, 885 F.2d at 1161; *In re Merrill*, 343 B.R. at 11; *In re P & G Drywall and Acoustical Corp.*, 156 B.R. at 706.

[137] *Sourcing Unlimited, Inc.*, 526 F.3d at 47.

[138] *In re Nat'l Gypsum Co.*, 118 F.3d at 1067.

[139] *Id.* at 1068-1069.

statutory causes of action created by the Bankruptcy Code that belong to the Trustee.[140]  They are not

derivative of the Debtors' claims, but are unique rights given to bankruptcy trustees on behalf of the

creditors of the estate and are not available to debtors outside the bankruptcy court.[141]  Similarly, the

Trustee's fraudulent transfer claims under Texas Bus. & Com. Code Ann. § 24.005-6, and Mass.

Gen. Laws Ch. 109A, §§ 5 and 6, are creditor claims which 11 U.S.C. § 544(b)(1) allows the Trustee

to assert on behalf all creditors of the estate.[142]  As such, these claims are proceedings derived

exclusively from the Bankruptcy Code.  Having made such a determination, I must turn to the second

part of the *In re Nat'l Gypsum Co.* analysis and consider whether arbitration inherently conflicts with

the purpose of the Bankruptcy Code.

I note that the fact that only the Trustee can bring these claims in bankruptcy court may

evidence Congressional intent to preclude arbitration of such claims and satisfy the *Randolph* test.

In any event, I find that an inherent conflict exists as arbitration will not serve the goal of centralized

resolution of purely bankruptcy issues, the need to protect creditors from piecemeal litigation, or the

undisputed power of a bankruptcy court to enforce its own orders.  This is particularly the case where

there are allegations of unauthorized post-petition transfers which could diminish the Debtors'

estates and harm the other unsecured creditors.  Therefore, having satisfied the second prong of the

*Randolph* test, I have discretion to refuse to compel arbitration of  Counts XV through XX, which

---

[140] *See* 11 U.S.C. §§ 547(b) (""Except as provided in subsection (c) or (i) of this section, the trustee may avoid any transfer of interest of the debtor in property – . . ."), 548(a)(1) ("The trustee may avoid any transfer . . ."), 549(a) ("Except as provided in subsection (b) or (c) of this section, the trustee may avoid a transfer of property of the estate – . . ."), 550.

[141] *See, e.g., Allegaert v. Perot*, 548 F.2d 432 (2d Cir. 1977) (refusing to compel arbitration of trustee's preference and fraudulent transfer claims under the Bankruptcy Act).

[142] *Hays*, 885 F.2d at 1155; *In re Barney's, Inc.*, 206 B.R. 336 (Bankr. S.D.N.Y. 1997).

41

I will exercise.

The Trustee's claim for equitable subordination also arises exclusively under the Bankruptcy Code and is unique to bankruptcy proceedings.[143]  With respect to the second part of the *In re Nat'l Gypsum Co.* analysis, I find that arbitration of this claim inherently conflicts with all the previously mentioned purposes of the Bankruptcy Code.[144]  An arbitrator could not subordinate Heritage's claim against the Debtors' estates under 11 U.S.C. § 510(c) without effecting the rights of other creditors. As such, the determination of the priority of claims is solely a function of the bankruptcy courts and cannot be arbitrated. Accordingly, I have discretion under the *Randolph* test, and will use it to decline to compel arbitration of Count XXII.

In a slightly different vein, an objection to claim is not a cause of action, but a proceeding derived exclusively from 11 U.S.C. § 502(b).  The United States Court of Appeals for the Fifth Circuit explained the claims objection process as follows:

> A claim against the estate is instituted by filing a proof of claim as provided by the bankruptcy rules. The filing of the proof invokes the special rules of bankruptcy concerning objections to the claim, estimation of the claim for allowance purposes, and the rights of the claimant to vote on the proposed distribution. *Understood in this sense, a claim filed against the estate is a core proceeding because it could arise only in the context of bankruptcy.* Of course, the state-law right underlying the claim could be enforced in a state court proceeding absent the bankruptcy, but the nature of the state proceeding would be different from the nature of the proceeding following the filing of a proof of claim.

> The Court's language would seem equally applicable in the case at bar. Only in bankruptcy court are there these peculiar, summary procedures for resolving claim objections. While the underlying rights at issue in the objection might be enforceable outside the bankruptcy context, different, unique procedures are utilized to resolve

---

[143] *See* 11 U.S.C. § 510(c).

[144] *See In re Transport Associates, Inc.*, 263 B.R. 531, (Bankr. D. Kan. 2001).

the claim in the bankruptcy court.[145]

Courts interpreting *In re Nat'l Gypsum Co.* have noted that its two part analysis requires an examination of the *underlying proceeding* and not necessarily the cause of action asserted.[146] While the court of appeals in *In re Nat'l Gypsum Co.* explained that bankruptcy courts have the most discretion when adjudicating bankruptcy rights, it clearly recognized that discretion exists "where a particular *bankruptcy proceeding* meets the standard for nonenforcement of an arbitration clause set forth in *McMahon* and *Rodriguez*."[147] Reading *In re Nat'l Gypsum Co.* in this light, the court in *In re Mirant Corp.* concluded that "[w]hile the substance of a dispute may be governed by law peculiar to bankruptcy, the court does not perceive the first part of the *Nat'l Gypsum* test to *require* that the *substantive* issues in dispute be derived from the Code."[148] As such, the court found that it had discretion to refuse to compel arbitration of an objection to claim.[149]

In the present case, the Trustee's objection to claim, although partly sounding in contract, is clearly a proceeding derived exclusively from the provisions of the Bankruptcy Code. Moreover,

---

[145] *Wood v. Wood ( In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987) (citations omitted) (emphasis added).

[146] *See In re Mirant Corp.*, 316 B.R. 234 (Bankr. N.D. Tex. 2004); *Martinez v. Beneficial of Texas, Inc. (In re Martinez)*, Adv. P. No. 06-3669, 2007 WL 1174186 (Bankr. S.D. Tex. Apr. 19, 2007); *cf. Erie Power Tech., Inc. v. Ref-Chem, L.P.*, 315 B.R. 41 (Bankr. W.D. Pa. 2004) (arbitrating claims objection did not inherently conflict with the Bankruptcy Code where the Debtor initiated the arbitration proceedings, which were set to begin, and no other causes of action specific to the Bankruptcy Code existed); *In re Winimo Realty Corp.*, 270 B.R. at 108 (reversing the bankruptcy court's refusal to compel arbitration because there was no evidence that arbitration would jeopardize the underlying policy of the Bankruptcy Code).

[147] *In re Nat'l Gypsum Co.*, 118 F.3d at 1067 (emphasis added).

[148] *In re Mirant Corp.*, 316 B.R. at 238 (emphasis in original).

[149] *Id.*

43

while the core/non-core distinction is not determinative, courts have held that resolving a disputed

claim is a core matter under 28 U.S.C. § 157(b)(2)(B) to be decided by the bankruptcy court, even

where the basis for the creditor's claim involves a pre-petition breach of contract claim.[150]  As such,

the Debtors' Contract Claims, as well as the Trustee's claim for Turnover pursuant to 11 U.S.C. §

542, may be procedurally characterized as a defense to Heritage's proof of claim within the objection

to claim proceeding.[151]

    With respect to the second part of the *In re Nat'l Gypsum Co.* analysis, arbitration of the

Trustee's objection to claim proceeding, which includes the determination of the Contract Claims,

would contravene the Bankruptcy Code's purpose of providing a central forum for the resolution of

claims.  As other claims have been filed in this case, arbitration of these claims would require the

Trustee to resolve claims in multiple fora.  Moreover, where at least sixteen out of twenty-five causes

of action in these adversary proceedings will not be sent to arbitration, and where the remaining

counts include a subset of Non-Covered Transactions which are not arbitrable, arbitration of these

final claims would result in piecemeal, and possibly duplicative, litigation.  While admittedly neither

Debtor is reorganizing, resolution of these remaining counts in the bankruptcy court would also serve

---

[150] *See Systolic Nerworks, Inc. v. Bizfon, Inc. (In re Bizfon, Inc.)*, No. 01-12547 JMD,
2002 WL 181975 (Bankr. D.N.H. Jan. 29, 2002).

[151] While Heritage only filed a proof of claim in Paul's bankruptcy case, I note that it was
not required to do so in RGI's.  "A secured creditor may, but need not, file a proof of claim.
Under the express provisions of § 501, if it does so, and no objection is filed, its secured claim is
"deemed allowed." If it files no proof of claim and no action is taken with regard to its lien, the
lien is unaffected by bankruptcy. In other words, unless the secured creditor is hailed into
bankruptcy court to respond to an effort to alter, amend or avoid its position, it may ignore the
bankruptcy proceedings. The lien passes through bankruptcy."  *In re Maylin*, 155 B.R. 605, 611-
613 (Bankr. D. Me. 1993); *see also In re Tinker*, 355 B.R. 380, 384-385 (Bankr. D. Mass. 2006).

the purpose of expeditiously and equitably distributing the Debtors' assets. I find that arbitration of

the Trustee's objection to claim, Contract Claims, and Turnover claim inherently conflict with the

purposes of the Bankruptcy Code, granting me discretion to refuse to compel the arbitration of these

claims under the *Randolph* test. As such, I will not refer Counts VI through XII, XIV, XXI, and

XXV to arbitration.

As I will not refer the Plaintiffs' fraud claims to arbitration, I must now consider whether they

should be dismissed for failure to plead fraud with the requisite particularity.

B.  Dismissal of Fraud Claims Under Fed. R. Civ. P. 9(b)

Fed. R. Civ. P. 9(b) provides:

> Fraud or Mistake; Conditions of Mind. In alleging fraud or mistake, a party must
> state with particularity the circumstances constituting fraud or mistake. Malice,
> intent, knowledge, and other conditions of a person's mind may be alleged
> generally.[152]

"Generally, there are three purposes behind Rule 9(b)'s particularity requirement: (1) to place the

defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of

a groundless fraud claim as a pretext to discovering a wrong or as a "strike suit"; and (3) to safeguard

defendants from frivolous charges which might damage their reputations."[153]  The United States

Court of Appeals for the First Circuit has held that where Plaintiffs plead fraud under Fed. R. Civ.

P. 9(b), "the pleader *usually* is expected to specify the who, what, where, and when of the allegedly

false or fraudulent representation."[154]  "[T]he particularity requirement of Rule 9(b) must be relaxed

---

[152] Fed. R. Civ. P. 9(b).

[153] *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987).

[154] *Alternative Sys. Concepts, Inc.*, 374 F.3d at 29 (emphasis added); *Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir.1991); *McGinty v. Beranger Volkswagen, Inc.*, 633

45

where the plaintiff lacks access to all facts necessary to detail his claim."[155]  Courts have noted that

where the information needed to plead the particulars of fraud are in the hands of the defendant,

allegations of fraud that are sufficiently particular to suggest that the plaintiff is not engaged in a

frivolous suit and enables the defendants to respond will not be dismissed prior to discovery.[156]

Here, the Plaintiffs' promissory estoppel, negligent misrepresentation, and deceit claims are

premised on allegations that on or about February 7, 2005, Heritage, Ivy, and Halperin outlined the

Employment Agreement which included favorable terms of compensation and conditioned Paul's

employment on him first doing a number of things, including: selling his Massachusetts home and

establishing permanent residency in Dallas, Texas; abandoning all business interests; immediately

settling all pending litigation; and consigning personal and RGI collectible inventories to Heritage

for auction.[157]  They further allege that subsequent negotiations among Paul, Ivy, and Halperin took

place, but that an agreement was reached no later than March 15, 2005.[158]  Moreover, the Plaintiffs

allege that in reliance on the terms of the Employment Agreement, Paul settled all pending litigation

on otherwise disadvantageous terms.[159]  Despite alleged reassurances from Ivy, Heritage never

provided the promised terms of employment.[160]

---

F.2d 226, 228 (1st Cir.1980).

[155] *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998).

[156] *See, e.g., Frontier Mgmt. Co., Inc. v. Balboa Ins. Co.*, 658 F.Supp. 987, 992-993 (D. Mass. 1986).

[157] Complaint, Docket No. 1, ¶¶ 13, 15.

[158] *Id.* at ¶ 13-14.

[159] *Id.* at ¶ 15.

[160] *Id.* at ¶¶ 16-18.

The Plaintiffs allegations successfully state: the "who," i.e., Ivy, Halperin, and Heritage; the "what," i.e., representations of generous employment terms; and the "when," i.e., on or around February 7, 2005, with negotiations culminating in an agreement by March 15, 2005.  Admittedly, they do not allege where such representations took place.  This failure, however, does not require dismissal of these claims because this fact is known, or readily ascertainable, to the Defendants.[161]  Moreover, I disagree with the Defendants assertion that the Plaintiffs' failed to state the role of each actor in the alleged fraud as the Plaintiffs' plead in the conjunctive, indicating that each Defendant made the representation during the course of negotiations.

With respect to his fraudulent transfer claims, the Trustee asserts the following:

> To the extent that any transfers of interest of the property of the Debtors[,] Mr. Paul or RGI were made to Heritage and were not properly credited by Heritage, such transfers were transfers of interest of one or both of the Debtors in property, for which the Debtor received less than a reasonably equivalent value in exchange for such transfers, at a time when the Debtor was insolvent on the date that such transfers were made.[162]

The Defendants, therefore, seek dismissal of these claims because the Trustee has not identified the alleged fraudulent transfers with particularity.  While true, without an opportunity for discovery, the Trustee has no ability to specifically identify which transfers out the thousands that have allegedly taken place between the Debtors and Heritage are fraudulent.  Moreover, as the documentation the Trustee requires to identify these transfers is in the possession of Heritage, grounds currently exist

---

[161] *Vincent v. Ameriquest Mortgage Co. (In re Vincent)*, 381 B.R. 564, 574 (Bankr. D. Mass. 2008).

[162] Complaint, Docket No. 1, ¶¶ 101, 108.

to relax the otherwise strict standard under Fed. R. Civ. P. 9(b).[163]

## V. <u>CONCLUSION</u>

In light of the foregoing, I will enter an order denying the Motion to Compel.

_____
William C. Hillman
United States Bankruptcy Judge

Dated: November 4, 2008

---

[163] *See Alternative Sys. Concepts, Inc.*, 374 F.3d at 29; *Frontier Mgmt. Co., Inc.*, 658 F.Supp. at 992-993.  While the Trustee must ultimately amend his Complaint, ordering him to do so at this time is inappropriate as a discovery schedule is not yet in place.

48